BUSINESS BROKERAGE CENTRE, a partnership composed of Cecil R. Bishop and Norman H. Hensley, Plaintiff–Appellant,

v.

Betty J. DIXON and Fred W. Dixon, Jr., Co–Administrators of the Estate of Fred W. Dixon, Defendants–Appellees.

Supreme Court of Tennessee, at Knoxville.

March 28, 1994.

Carl W. Eilers, Kingsport, for plaintiff-appellant.

Frank L. Slaughter, Slaughter, Hudson & Dougherty, Bristol, for defendants-appellees.

J. Russell Farrar, Farrar & Bates, Nashville, for amicus curiae Tennessee Ass'n. of Realtors.

## OPINION

DROWOTA, Justice.

Business Brokerage Centre (BBC) appeals from the Court of Appeals' affirmance of the trial court's judgment for the defendants-counterclaimants, the co-Administrators of the estate of Fred W. Dixon, Sr., in BBC's

action to recover a commission allegedly owed to it for the sale of Dixon's business. This case presents two issues for our review: (1) whether the Tennessee Real Estate Broker's Act of 1973, Tenn.Code Ann. § 62–13–101 et seq., requires that a "business broker" possess a real estate broker's license to be entitled to recover a commission for the sale of a business when real property is included in the assets of the business; and (2) whether the defendants-counterclaimants are entitled to an award of treble damages pursuant to Tenn.Code Ann. § 62–13–110(c) because of BBC's actions.

## THE FACTS

In 1989 Fred W. Dixon, Sr. and his wife Betty decided to sell their shares of stock in Dixon Tool and Engineering, Inc. (DTE), as well as the assets of the tool-and-die business. DTE's assets included land and buildings, machinery, inventory, and accounts receivable. Dixon listed his business with the plaintiff BBC, a partnership composed of Cecil R. Bishop and Norman H. Hensley which specializes in the sale of business entities. Hensley is licensed to sell securities, life insurance and health insurance; and Bishop is a certified public accountant who had performed accounting services for Dixon individually and for DTE for several years. Neither Bishop nor Hensley is licensed to sell real estate in Tennessee.

The listing and commission agreement entered into by Dixon and BBC provided that upon the sale of the business, BBC was to receive a 10% commission of the total selling price of the business; the "total selling price" included "all transferred assets, transferred debts, notes, loans, and management contracts." The agreement set the asking price of the business at $800,000 plus accounts receivable; the effective asking price was approximately $850,000. The assets of the business were not separately valued in the agreement, but a handwritten notation on the agreement provided that the commission was "not to exceed $60,000 (No comm. on building and land) (approx. $250,000)." This language was inserted by BBC, and it is unclear as to exactly when in the negotiations process this

language was added. It is also unclear how BBC arrived at the $250,000 figure.

At some point after the listing agreement was signed, W. Devoid Wright, a North Carolina businessman, contacted BBC regarding the possible purchase of DTE. Wright travelled to Tennessee, and Bishop showed him around the DTE plant and put him in contact with Fred Dixon. Wright ultimately purchased the business from the Dixons for $884,000. The sales contract entered into by the Dixons and Wright allocated $450,000 of the purchase price to real property (land and improvements) and $434,000 to personal property. Although BBC asserts in brief that it was surprised that the amount allocated to real property was greater than the real property allocation in the listing agreement, the record reveals that Bishop played a significant part in the negotiating process, was present when the contract was signed, and was present at the closing of the sale.

At the closing Fred Dixon executed two promissory notes—one in the amount of $30,000 and the other in the amount of $20,000—to BBC as payment for the balance of the $60,000 commission as provided in the listing agreement (Dixon had previously paid $10,000 to BBC as earnest money). Dixon paid $8,306 on the $30,000 note before his death; the administrators of his estate, however, refused to make any further payments on either of the notes. BBC then brought an action to recover the amounts owed on the notes, but the administrators of Dixon's estate counterclaimed, alleging that the notes were voidable because BBC had violated § 62–13–103 by acting as a real estate broker without first obtaining a real estate broker's license. The administrators also requested that the court award treble damages pursuant to Tenn.Code Ann. § 62–13–110(c).

After a bench trial, the trial court held in favor of the defendants-counterclaimants, and ordered that the $18,306 previously paid to BBC be refunded. The trial court, however, refused to award treble damages. The Court of Appeals affirmed this judgment by a memorandum opinion. We granted BBC's Rule 11 application to clarify the licensing requirements of the Act with respect to per-

sons engaged in selling businesses whose assets include real property.

## I.

█ The Tennessee Real Estate Broker License Act of 1973 is designed to protect the public from irresponsible or unscrupulous persons dealing in real estate. *Prowell v. Parks,* 767 S.W.2d 633, 634 (Tenn.1989). To achieve this end, the Act requires persons dealing in real estate to obtain a real estate broker's license, Tenn.Code Ann. § 62–13–301, and the failure to obtain a broker's license before engaging in acts defined as "brokering" is punishable as a Class B misdemeanor. Tenn.Code Ann. § 62–13–110(a)(1). Moreover, the Act also denies a nonlicensed person access to the courts to recover any commission, finders fee, or other compensation for the prohibited acts. Tenn.Code Ann. § 62–13–105. To maximize the deterrent effect of the Act, the Legislature drafted its provisions broadly. The basic provision, Tenn.Code Ann. § 62–13–103, provides that

(a) Any person who, directly or indirectly for another, with the intention or upon the promise of receiving any valuable consideration, offers, attempts or agrees to perform, or performs, any single act defined in § 62–13–102, whether as a part of a transaction, or as an entire transaction, is deemed a broker, affiliate broker or time share salesperson within the meaning of this chapter.

(b) The commission of a single such act by a person required to be licensed under this chapter and not so licensed constitutes a violation thereof.

The term "broker" is defined in § 62–13–102 as

[A]ny person who for a fee, commission, finders fee or any other valuable consideration, or with the intent or expectation of receiving the same from another, solicits, negotiates or attempts to solicit or negotiate the listing, sale, purchase, exchange, lease or option to buy, sell, rent or exchange for any real estate or of the im-

provements thereon or any time-share interval as defined in the Tennessee Time-Share Act, compiled in title 66, chapter 32, collects rents or attempts to collect rents, auctions or offers to auction, or who advertises or holds himself out as engaged in any of the foregoing.

The term "real estate" is also defined broadly. Section 62–13–102(4) defines the term as "leaseholds, as well as any other interest or estate in land, whether corporeal, incorporeal, freehold or nonfreehold, and whether the real estate is situated in this state or elsewhere."

Although this Court has never addressed the issue of whether the Act requires persons engaged in selling business entities to obtain a real estate broker's license if real property is included in the entity's assets,[1] other jurisdictions with licensing statutes similar to Tennessee's have considered this issue. The issue has by no means produced a consensus and three different approaches are discernible in the cases. Several jurisdictions with similar statutes appear to hold that if a sale of the ongoing business contains any real estate component, no matter how *de minimis,* the broker will be denied any commission. *See e.g., Ford v. American Medical Intern, Inc.,* 228 Neb. 226, 422 N.W.2d 67 (1988); *Thomas v. Jarvis,* 213 Kan. 671, 518 P.2d 532 (1974); *Knight v. Johnson,* 741 S.W.2d 842 (Mo.Ct.App.1987); *Lockridge v. Hale,* 764 S.W.2d 84 (Ky.Ct.App.1989); *Bonasera v. Roffe,* 8 Ariz.App. 1, 442 P.2d 165 (1968); *Doran v. Imeson Aviation, Inc.,* 419 F.Supp. 586 (D.Wyo.1976) (applying Wyoming law). These courts refuse to divide the transaction into real and personal property elements; rather, they view the transaction as a whole, and often emphasize that the deal would not have gone through without the realty component (as in this case, where Wright testified that he wanted the entire business or nothing). These courts establish a "bright-line" rule to maximize the protective purpose of the real estate broker legislation.

Other jurisdictions, however, construe similar statutes in a different way. These courts

---

1. Two Court of Appeals decisions—*Stinson v. Potter,* 568 S.W.2d 291 (Tenn.App.1978), and *Dickerson v. Sanders Manufacturing, Inc.,* 658 S.W.2d 535 (Tenn.App.1983)—deal with this issue and will be discussed *infra.*

hold that the business broker is not precluded from recovering a commission if the real estate component is "merely incidental" to the sale of the entire business. See *Weingast v. Rialto Pastry Shop*, 243 N.Y. 113, 152 N.E. 693 (1926); *Frier v. Terry*, 230 Ark. 302, 323 S.W.2d 415 (1959); *Cary v. Borden Co.*, 153 Colo. 344, 386 P.2d 585 (1963); *Quick Shops of Mississippi v. Bruce*, 232 So.2d 351 (Miss.1970); *Scott Hubbard Co. v. Sika Chemical Corp.*, 708 F.Supp. 945 (N.D.Ill.1989) (applying Illinois law). These courts also cite legislative purpose to support their decisions, but stress that real estate broker statutes are intended to protect unsophisticated homebuyers, not knowledgeable persons buying and selling entire businesses. These courts also look to the transaction as a whole; they, however, tend to emphasize the ultimate purpose of the transaction (the sale of an entire business), rather than focussing on the fact that the transaction contains a real estate component. Some of these courts require that the parties designate the value of the personal and real property elements in the listing agreement, or elsewhere, to be entitled to a commission. *Marks v. Walter McCarty Corp.*, 33 Cal.2d 814, 205 P.2d 1025 (1949). Moreover, most of these jurisdictions hold that the broker may only recover a commission based on the personalty element of the commission, not on the value of the entire transaction. *Quick Shops of Mississippi, supra.*

At least one jurisdiction, New Jersey, does not require that the personal property component outweigh the real estate component in order for the broker to recover a commission on the personal property. *Kazmer–Standish Consultants v. Schoeffel Instruments Corp.*, 89 N.J. 286, 445 A.2d 1149 (1982). Moreover, the *Kazmer–Standish* court does not even require the parties to designate values for the realty and the personalty in the listing agreement, which had been required in many "merely incidental" cases; it simply requires that the personalty be susceptible to a reasonable valuation. The Court supports this "pure severability" view by arguing that the statutes should not apply to parties buying and selling businesses, and that it is a windfall to the buyer or seller to use the broker's services and then refuse to pay the broker's rightfully earned commission.

In the two appellate decisions that have addressed this issue—*Stinson v. Potter*, 568 S.W.2d 291 (Tenn.App.1978), and *Dickerson v. Sanders Manufacturing Co.*, 658 S.W.2d 535 (Tenn.App.1983)—the Court of Appeals did not utilize one of these tests, but seemed to incorporate elements of all three. In *Stinson* the unlicensed plaintiff[2] sought to recover a commission after selling a Tennessee coal mining operation. The listing agreement entered into by the plaintiff and the seller provided that the plaintiff was to receive as a commission any amount received in the sale in excess of $600,000. After setting out the different approaches discussed above, and noting the broad scope of the Act, the Court of Appeals held that the plaintiff was not entitled to a commission on the sale. The Court reasoned that

> The statutory language used in T.C.A. § 62–1302 is determinative of the issues in this case. The legislature obviously intended that the Real Estate Broker License Act should apply to all brokers involved in transactions resulting in the sale of real estate and has required strict compliance with the terms of the Act before a broker can use the courts to collect fees or commissions. The plaintiff's commission contract for the sale of defendants' coal mining operation fits within the category of a sale of any interest in land or improvements thereon. We therefore conclude that the plaintiff is not entitled to receive a commission on the sale of defendants' coal mining operation because (1) the sale of a going business including an interest in real estate is within the broad language used in our Act; (2) the plaintiff did not have a Tennessee real estate broker's license while negotiating the sale of defendant's property in this state; and (3) the contract entered into by the plaintiff and the Potters [the sellers] is not divisible, the commission being the total amount received in excess of $600,000.

568 S.W.2d at 295.

The Court of Appeals followed *Stinson* in a similar situation in *Dickerson v. Sanders*

---

**2.** The plaintiff did have a Kentucky real estate license.

*Manufacturing Co.,* 658 S.W.2d 535 (Tenn. App.1983). In *Dickerson* the unlicensed plaintiff sought to recover a commission on the sale of a manufacturing company. The listing agreement entered into by the plaintiff and the seller provided that the plaintiff was to receive a commission of "10% on the total purchase price of the company, building and real estate upon the closing of this transaction." In rejecting the plaintiff's argument that the Act should not apply to situations in which the real estate component comprised less than 5% of the purchase price of the business, the Court cited the above-quoted language in *Stinson* and stated

> Tracking the factors enumerated in *Stinson,* in this case it is undisputed that (1) Dickerson at all relevant times lacked a real estate broker's license and (2) the attempted sale of Sanders Manufacturing included an interest in real estate. Finally, (3) severance of this transaction into a sale of personalty and a sale of realty to avoid a harsh application of the statute is impossible. The evidence clearly shows that plaintiff's commission was to be "10% of the total purchase price of the company, building and real estate upon the closing of this transaction."

658 S.W.2d at 537.

*Stinson* and *Dickerson* are susceptible to more than one interpretation. Because both decisions held that the sale of a business containing real estate is within the ambit of the Act, the decisions can be said, as the administrators of the Dixon estate urge, to have adopted the "bright-line" rule. Conversely, BBC argues that because the Court of Appeals discussed the possibility of severing the transaction into real and personal property components in both cases, the Court in fact utilized either the "merely incidental" or the "pure severability" approach, but denied recovery based on the particular factual circumstances of each case. BBC argues that, because it specifically allocated the purchase price between real and personal property in the listing agreement, and because it disavowed any intention to collect a commission on the real property assets of DTE, it is entitled to recover under either of these approaches. BBC argues that either of these approaches are preferable to the "bright-line" rule because they more accurately reflect conditions in the market for businesses as going concerns, in which all parties are equipped with adequate economic knowledge and experience.

We find BBC's contentions regarding the legislative purpose of the Act persuasive. After considering the Act as a whole, and after reviewing its legislative history, this Court firmly believes that the central, overriding objective of the Act is to protect purchasers against unfair and deceptive practices that are peculiar to the sale of real property. Several commentators, as well as the New Jersey Supreme Court in *Kazmer–Standish,* have emphasized this legislative purpose and have noted the incongruity of imposing a requirement of obtaining a real estate broker's license on legitimate business brokers. *See* Comment, *Recovery of Commission by Unlicensed Real Estate Brokers,* 80 Dickinson L.Rev. 500 (1976); Note, *The Business Broker and the Oklahoma Licensing Code,* 12 Tulsa L.J. 398 (1976). While it is true that our real estate broker statutes are broad, and the literal language of those statutes arguably could be applied to situations in which real estate constitutes a minor part of the sale of an entire business, it is also a well-settled rule of construction that statutes must be understood in light of the purposes the Legislature intended to accomplish by their passage. *Tidwell v. Collins,* 522 S.W.2d 674 (Tenn.1975); *In re Arnett,* 731 F.2d 358 (6th Cir.1984). And in the event that the intent of the Legislature conflicts with the language of the statutes, or when the language produces an absurd or incongruous result when applied in specific factual situations, the intent of the Legislature will prevail over the literal language of the statute. *City of Nashville v. Gibson County,* 201 Tenn. 216, 298 S.W.2d 540 (1957); *Williams v. Cothron,* 199 Tenn. 618, 288 S.W.2d 698 (1956). Therefore, because we agree with the above-cited authorities that our real estate broker statutes simply do not fit the realities of the market for businesses as going concerns, we must reject the "bright-line" approach because the application of that rule produces results that are not consonant with the legislative intent underly-

ing the Act. We do, however, realize that the application of the "bright-line" rule does not produce an absolute conflict with the legislative purposes of the Act; and we thus invite the Legislature to clarify this area if it deems necessary.

 While we agree with some of the New Jersey Supreme Court's observations in *Kazmer–Standish,* we must reject the "pure severability" approach utilized by that court because we believe that the "merely incidental" approach better serves the legislative purposes of the Act. This approach helps to insure that the object of the transaction will in fact be the sale of a business entity; it lessens the possibility that a transaction which is actually or primarily undertaken for the purpose of selling real estate can be merely characterized by the parties as a transaction for the sale of a business in order to circumvent the real estate broker statutes. Because we expressly adopt the "merely incidental" approach, the Court of Appeals' decision in *Dickerson, supra,* is overruled to the extent that it held that our real estate broker statutes categorically prohibit the use of that approach.

The application of these rules to the present situation leaves little doubt as to the proper result. Pursuant to the sales contract, the real estate component constitutes approximately 51% of the transaction, an amount that in no way can be characterized as merely incidental in view of the entire transaction. Moreover, even if we accept the valuation of the real estate in the listing agreement as BBC urges us to do, real estate comprises approximately 30% of the transaction. While this amount obviously does not predominate, it is nevertheless a substantial part of the transaction, and therefore cannot be regarded as incidental. Because we reach the same result as the Court of Appeals after utilizing the "merely incidental" approach, the judgment of that Court as to the first issue is hereby affirmed.

## II.

The next issue for our determination is whether the Court of Appeals erred by affirming the trial court's decision to deny treble damages to the defendants-counter-claimants. Tenn.Code Ann. § 62–13–110 provides that a person who has received any compensation for acts prohibited by the Act may be liable for a penalty of not less than the amount so received and not more than three times the amount received. The decision of whether treble damages are warranted is left to the discretion of the trial court in each case. Here we see no reason to award treble damages, because like the trial court, we find no evidence of fraud or willfulness in the record before us. The judgment of the Court of Appeals on this issue is hereby affirmed.

REID, C.J., and O'BRIEN, ANDERSON and BIRCH, JJ., concur.